IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 109-040 |
| | ) | |
| ALEX RODGER, III | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused *pro se* Defendant

Rodger of (1) armed robbery of a bank in violation of 18 U.S.C. § 2113(a) & (d), and (2)

carrying, using, and brandishing a firearm during a crime of violence in violation of 18

U.S.C. § 924(c). Defendant is alleged to have robbed the Bank of America at 2853

Washington Road in Richmond County on February 13, 2009. The matter is now before the

Court on Defendant's motions to suppress evidence obtained from the trunk of his vehicle

in McDuffie County shortly after the robbery, as well as all identification testimony related

to the identification "show-up" conducted at the Bank of America on the same day. (Doc.

nos. 22, 25, 29, 35).

The Court held an evidentiary hearing on August 10, 2009, at which time the Court

heard testimony from the following individuals: (1) Lieutenant Scott Peebles ("Lt. Peebles")

of the Richmond County Sheriff's Office ("RCSO"); (2) Deputy Rachel Hardin ("Deputy

Hardin") of the RCSO; (3) Sergeant Ron Sylvester ("Sgt. Sylvester") of the RCSO; (4)

Investigator Jason Vinson ("Inv. Vinson") of the RCSO, assigned to the Safe Streets Task

Force of the Federal Bureau of Investigation ("FBI"); (5) Sergeant Blaise Dresser ("Sgt.

Dresser") of the RCSO; (6) Investigator Tom Johnson ("Inv. Johnson") of the RCSO; (7) Investigator Patrick Cullinan ("Inv. Cullinan") of the RCSO; (8) Deputy Barry Whitfield ("Deputy Whitfield") of the McDuffie County Sheriff's Office ("MCSO"); (9) Deputy Gabriel Garner ("Deputy Garner") of the RCSO; and (10) Defendant.[1]  On March 16, 2010, and March 19, 2010, the Court heard additional testimony from Deputy Whitfield, as well as three Bank of America employees who were present during the robbery and participated in the identification show-up, namely, Ms. Latoya Johnson, Mr. Douglas Graves, and Ms. Gloria Ivory.[2]  For the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress be **DENIED**.  (Doc. nos. 22, 25, 29, 35).

## I. PROCEDURAL HISTORY

Before detailing the testimony of the pertinent witnesses and discussing the issues raised in Defendant's motions to suppress, a brief procedural history of this case will be helpful in understanding the need for multiple hearings and the length of time necessary to resolve Defendant's motions.  As noted above, on August 10, 2009, the Court held an evidentiary hearing on Defendant's motions, at which time the Court heard extensive testimony from Lt. Peebles, Deputy Hardin, Sgt. Sylvester, Inv. Vinson, Sgt. Dresser, Inv. Johnson, Inv. Cullinan, Deputy Whitfield, Deputy Garner, and Defendant.  Defendant then filed motions requesting a copy of the transcript of the August 10th hearing and an extension of time to file his objections to the anticipated adverse recommendation on his motions to

---

[1] For the reasons discussed below, Defendant's testimony has been stricken from the record.  See *infra* Part II.B.5.

[2] The Court notes that Defendant's court-appointed, stand-by counsel, Mr. Jason R. Troiano, was present at the August 10, 2009 hearing, as well as the hearings conducted on March 16, 2010, and March 19, 2010.

suppress. (Doc. nos. 60, 61). The Court granted these motions, specifically directing the court reporter to file a copy of the transcript with the Court and to serve Defendant with the copy of the same. (Doc. no. 64, p. 1). The Court also granted Defendant ten (10) days from the date the transcript was filed with the Court to file his objections to the forthcoming Report and Recommendation ("R&R"). (Id. at 2).

The Court entered its R&R recommending that Defendant's motions to suppress be denied on August 31, 2009, (see generally doc. no. 66), and the court reporter filed the 142-page transcript with the Court on September 23, 2009, (see doc. no. 73). Two days earlier, Defendant had requested yet another extension of time to file his objections to the R&R, and accordingly, after the transcript was filed, the Court granted Defendant until October 16, 2009, to file his objections. (See doc. nos. 71, 74). However, on October 9, 2009, before the time for Defendant to file his objections had expired, the Court vacated the August 31st R&R to allow Defendant to elicit testimony from the three bank employees regarding the conditions under which the identification show-up was conducted. (See doc. no. 78 (citing United States v. Price, 298 Fed. App'x 931 (11th Cir. 2008))).

The new hearing was scheduled for October 22, 2009. (See doc. no. 79). However, due to a conflict with the duties of Defendant's court-appointed, stand-by counsel, Jason R. Troiano, as an Associate Magistrate in Columbia County, the hearing was continued until November 17, 2009, (see doc. nos. 82, 90), with the Court specifically finding that "even though Defendant is proceeding *pro se* in this case, Mr. Troiano's presence at the hearing in his role as stand-by counsel is important," (doc. no. 82, p. 2).[3] Almost immediately after the

---

[3] See United States v. Travers, 996 F. Supp. 6, 17-18 (S.D. Fla. 1998) (appointing stand-by counsel for defendant who had elected to proceed *pro se* and requiring stand-by

hearing was re-scheduled for November 17th, counsel for the government advised the Court that Ms. Latoya Johnson, the bank teller who had been robbed and who had been scheduled to testify at the November 17th hearing, was on bed rest due to a high-risk pregnancy and that she would not be available to testify until after the first of the year, at the earliest. (See doc. no. 91; doc. no. 93, p. 2).

Given Ms. Johnson's unavailability, the Court continued the evidentiary hearing[4] and instead held a status conference on November 17th to give Defendant the opportunity to decide how he wished to proceed, given the fact that Ms. Johnson was unavailable to testify. (See doc. no. 92).[5] The Court specifically informed Defendant at the November 17th status conference that while it would not limit his options, he could wait until Ms. Johnson was available and have all three bank employees testify at the same time, or he could proceed with the testimony of the two available employees and have Ms. Johnson testify at a later date. Defendant stated that he needed time to consider his decision, and he later informed the Court that he wished to wait and call all three employees at the same time. (See doc. no. 94). Thus, Defendant's decision to wait until all three bank employees were available to testify further delayed the taking of testimony from the bank employees.

---

counsel's attendance at all hearings).

[4] See United States v. Twitty, 107 F.3d 1482, 1489 (11th Cir. 1997) (noting with approval the district court's decision to grant a continuance of the trial based on the ill health of an essential government witness).

[5] See United States v. Williams, 592 F.2d 1277, 1281 (5th Cir. 1979) (recognizing that a defendant should be given wide latitude to develop the factual circumstances about the suggestiveness of an identification procedure).

In January 2010, the Court directed counsel for the government to inform the Court when Ms. Johnson would be available to testify. (See doc. no. 95). However, before the government could respond and before a hearing could be scheduled, Defendant filed an *ex parte* motion for subpoenas for certain documents and information that the Court was compelled to address before scheduling a hearing. (See doc. no. 96).[6] Although Defendant stated that he needed these subpoenas to obtain certain evidence and the names of witnesses he intended to call at trial, this case had not yet been scheduled for trial by the presiding District Judge, and Defendant was clearly aware, based on the Court's recent instructions to counsel for the government, that the suppression hearing involving the three bank employees was going to be scheduled in the near future.[7] Based on these circumstances, the Court addressed Defendant's requests for subpoenas prior to scheduling the hearing with the bank employees. After denying Defendant's motions (see doc. no. 100), the Court set the matter down for a hearing and heard the testimony from the three bank employees on March 16, 2010, and March 19, 2010, (see doc. nos. 106, 107).

---

[6]Notably, after the government notified the Court that Ms. Johnson was available to testify (see doc. no. 97), Defendant filed a supplemental *ex parte* motion for subpoenas, clarifying the requests made in his original *ex parte* motion, (see doc. no. 98).

[7]The Court also notes that Defendant's requests for subpoenas concerned some of the same issues he had previously raised before the undersigned with respect to his motions to suppress. For example, Defendant requested that subpoenas be issued to the Sheriffs of Richmond, Columbia, and McDuffie Counties for "[v]erbatim transcribed hard copies" of the radio traffic recorded by the dispatchers in those counties on the day of the robbery. Notably, certain portions of radio traffic had been played by counsel for the government at the August 10th hearing, and Plaintiff's subsequently made multiple requests for a transcript of all radio traffic from Richmond, Columbia, and McDuffie Counties on the day of the robbery. (See doc. nos. 83, 86). The Court denied those requests, noting that the government had turned over all audio recordings of the radio traffic from those counties and that it would be "impossible, not to mention improper" to direct the court reporter to transcribe the inaudible portions of the recordings of the radio traffic Defendant already had in his possession. (Doc. no. 93, pp. 6-7). Accordingly, these circumstances also compelled the Court to address Defendant's requests for subpoenas before setting the matter down for a hearing.

In sum, the delay that occurred in obtaining the testimony of the three bank employees and resolving Defendant's motions was, in large part, the result of circumstances beyond the Court's control and Defendant's own decisions and actions, as detailed above.[8] Having addressed this issue, the Court turns to the testimony of the pertinent witnesses and the issues raised in Defendant's motions to suppress.

## II. FACTS

### A. Government's Case

#### 1. Testimony of Lt. Peebles

Lt. Peebles has been employed by the RCSO for the past 18 years and has worked as the supervisor of the Violent Crimes Division for the past 4 years.[9] On February 13, 2009, he received a phone call from Lieutenant Scott Gay ("Lt. Gay") of the Columbia County Sheriff's Office ("CCSO") alerting him that a robbery had taken place at the Bank of America located at 2853 Washington Road in Richmond County. Accordingly, Lt. Peebles turned on his police radio and learned from dispatch that a robbery had in fact occurred and that the following description of the suspect had been provided: a light-skinned black male with freckles who was in his 40s or 50s and wearing a light blue jacket. Dispatch also confirmed that, based on the signal emitted from the electronic tracking device that was secreted in the "bait money" given to the robber by the bank teller, the suspect was traveling west on Interstate 20 ("I-

---

[8]The Court notes that Defendant's requests for transcripts and an extension of time to file his objections to this Report and Recommendation, (see doc. nos. 109, 111), which have been addressed in a simultaneously filed Order, will also cause delay in this case.

[9]The Court has carefully reviewed the transcript of August 10th hearing in making this recommendation. (See doc. no. 73). While no transcripts of the March 16th and March 19th hearings have been prepared, the Court is in possession of the audio recordings of those hearings, which it has also carefully reviewed.

20").[10] As supervisor, Lt. Peebles accordingly instructed officers with the RCSO to coordinate with officers with the CCSO to slow down traffic in the westbound lane of I-20 in order to get a "good look" at the driver and passengers in each vehicle.

However, Lt. Peebles learned from dispatch (where the signal from the electronic tracking device was being monitored) that due to miscommunications between the RCSO and the CCSO, the suspect was able to evade police and make it through the Columbia County roadblock.[11] Accordingly, Lt. Peebles instructed that a second roadblock be set up in McDuffie County, in coordination with the MCSO. During the course of these events, Lt. Peebles contacted Sgt. Sylvester and instructed him to retrieve the handheld receiver used to pinpoint the exact location of the electronic tracking device and proceed to wherever the suspect was detained. While Lt. Peebles has no firsthand knowledge of the events that took place at the McDuffie County roadblock (as he was supervising operations by radio from his car parked at the Walgreens on Washington Road), he learned from radio traffic that the suspect was eventually identified and apprehended there. He also learned that the tracking device, a sum of money, and a bank bag were recovered from the trunk of the vehicle the

---

[10]By way of background, the Court notes that from the South Carolina/Georgia state line, I-20 West proceeds through Richmond County for approximately 7 miles and then crosses into Columbia County, proceeding for approximately 18 miles. It then crosses into McDuffie County and proceeds for approximately 11 to 12 miles before entering Warren County and proceeding toward Atlanta, Georgia.

[11]Although the terms "checkpoint" and "roadblock" were used interchangeably throughout the August 10th hearing, the Court refers to the methods implemented by law enforcement to apprehend Defendant as roadblocks in this recommendation, as the Supreme Court has used that term to describe the circumstances presented in this case, as discussed more fully below. See City of Indianapolis v. Edmond, 531 U.S. 32, 44 (2000) ("[T]he Fourth Amendment would almost certainly permit an appropriately tailored *roadblock* set up to . . . catch a dangerous criminal who is likely to flee by way of a particular route." (emphasis added)).

suspect had been driving, and that the suspect was transported back to the Bank of America for identification.

### 2. Testimony of Deputy Hardin

Deputy Hardin has been a member of the RCSO for almost 15 years and is currently assigned to the Crime Suppression Unit, as she was on February 13, 2009. On that day, she became involved with the investigation of the Bank of America robbery when she heard radio traffic about the incident and proceeded toward the Columbia County roadblock in accordance with Lt. Peebles' instructions. When Deputy Hardin learned that the suspect had gotten through that roadblock, she proceeded to the McDuffie County roadblock to begin observing the occupants of the slowed vehicles there. At some point, a driver later identified as the robbery suspect by Inv. Vinson pulled up and asked Deputy Hardin what was going on. Deputy Hardin informed him that she was "looking for somebody" and asked the driver to step out of the vehicle because, as she testified at the hearing, he fit the description of the suspect that had gone out over dispatch. Without objection, the driver complied with Deputy Hardin's request to step out of his vehicle, and Deputy Hardin patted him down for weapons. Deputy Hardin then asked the driver whether he minded if she looked in his trunk. The driver said, "Sure," and he popped the trunk of the vehicle with the automatic button on his key fob.[12]

Once the trunk had been opened, Deputy Hardin observed a blue jacket that also fit the general description of the type of jacket worn by the robber, as well as a bank bag, and

---

[12]Deputy Hardin testified that she did not inform the driver of the vehicle of his right to refuse consent or give him time to consider his decision or call an attorney because she "had no reason" to do so, and the driver never asked about declining consent or being afforded an opportunity to further consider his decision, with or without the advice of an attorney.

asked whether she could search the trunk further. She denied seeing a trash bag, battery cables, and various other items, explaining at the hearing that her attention was immediately drawn to the jacket and bank bag. The driver refused Deputy Hardin's request to search the trunk further and then lunged toward the jacket. At this point, Deputy Hardin moved the driver away from the trunk of the vehicle, stopped the search, and asked an MCSO officer (whom she did not identify) to watch the driver while she used her cell phone to inform other officers of the developments. Deputy Hardin testified that she did not arrest the driver of the vehicle at the time she observed the jacket and bank bag because she perceived him to be a very dangerous individual and wanted to make sure she did everything correctly. Inv. Vinson then arrived and identified the driver of the vehicle as the robbery suspect based on a photograph of the suspect received from an FBI agent on his PDA; Sgt. Sylvester arrived shortly thereafter with the receiver that, as discussed immediately below, was indicating that the tracking device was in close proximity.

After Inv. Vinson identified the driver of the vehicle as the robbery suspect, Deputy Hardin ordered the suspect on his knees and handcuffed him with his hands behind his back. Deputy Hardin then transported the suspect back to the Bank of America for identification, approximately 1 hour and 45 minutes after she initially learned about the robbery from dispatch. Deputy Garner accompanied Deputy Hardin back to the bank and assisted her during the identification show-up. When the robbery suspect was presented for identification, he was removed from the patrol car with his hands cuffed behind his back and flanked by both Deputy Hardin and Deputy Garner. The show-up was conducted approximately 12 to 15 feet from the Bank of America employees. Deputy Hardin does not remember seeing any news

cameras or other onlookers while the show-up was being conducted. While she does recall removing the suspect from the patrol car a second time, she did not explain the reason for doing so.

### 3. Testimony of Sgt. Sylvester

Sgt. Sylvester has been with the RCSO for almost 19 years and currently works in the Violent Crimes Division, as he did on the day of the robbery. On that day, Sgt. Sylvester received a phone call from Lt. Peebles instructing him to retrieve the handheld receiver used to pinpoint the precise location of the tracking device later found in the bank bag. Sgt. Sylvester reported that the receiver works by beginning to emit a beeping sound once it is within approximately 100 yards of the tracking device, and the sound becomes more frequent the closer the receiver comes to the device. Once the receiver is in the same location as the tracking device, the beeping becomes constant. While Sgt. Sylvester acknowledged that he has received no specific training in using the receiver, he had been advised as to how it worked on February 13th and has never had a problem using it.

On February 13th, upon receiving his instructions from Lt. Peebles, Sgt. Sylvester initially proceeded to the Bank of America, where he remained for a short period of time, and he then proceeded to the scene of the arrest. He arrived almost simultaneously with Inv. Vinson, who had just identified the driver of the vehicle detained by Deputy Hardin as the robbery suspect. Sgt. Sylvester testified that as he approached the vehicle the suspect had been driving, the beeping sound from the receiver became more frequent and became constant once he was standing next to the trunk of the vehicle. At that time, he observed the jacket in the trunk, which contained a large sum of money and a firearm, and all three items (the jacket,

10

the money, and firearm) were taken into evidence. The money was later returned to the Bank of America.

At the August 10th hearing, Sgt. Sylvester also observed a photograph of the robbery suspect taken from the surveillance video during the course of the robbery, as well as the mug shots taken of Defendant after he was arrested. Although Sgt. Sylvester acknowledged that there may have been a difference in skin tone and facial hair between the two sets of photographs, he nevertheless maintained that all the photographs appeared to depict Defendant Rodger.

### 4. Testimony of Inv. Vinson

Inv. Vinson is an investigator with the RCSO and is assigned to the Safe Streets Task Force of the FBI. On February 13, 2009, he became involved with the investigation of the Bank of America robbery when dispatch alerted him to the incident. While he initially headed east on I-20 based on dispatch reports, he changed direction once it was reported that the signal from the traffic device was indicating that the suspect was traveling west on I-20. Special Agent Tony Deprizio ("S.A. Deprizio"), an agent with the FBI, kept him updated on the status of the investigation while he was traveling to the scene of the arrest, and Special Agent Brian Ozden ("S.A. Ozden"), another FBI agent, was able to send him still photographs of the robbery suspect as depicted on the surveillance video at the Bank of America.[13]

---

[13]After the arrest, the originals of the photographs sent to Inv. Vinson's PDA were lost when the FBI's email system was compromised, causing the loss of all email attachments. (See doc. no. 46, p. 1). However, the photographs were later recovered from the security personnel at the Bank of America who had sent the photographs to S.A. Ozden, who in turn sent them to Inv. Vinson. (See id.). The photographs obtained from the Bank of America were admitted into evidence at the August 10th hearing as government's Exhibits 2, 3, and 4 (see doc. no. 59), and Inv. Vinson identified them as the same photos he received

As he was approaching the scene of the arrest in his patrol car, Inv. Vinson observed Deputy Hardin and the man he later identified as the robbery suspect standing at the rear of the vehicle and opened up the photograph attachments on his PDA sent by S.A. Ozden. Inv. Vinson testified that the photographs he had received on his PDA matched the visual he had of the suspect at that time. When he observed the suspect lunge towards the rear of the vehicle, he accelerated toward the scene of the arrest, and once he exited his car, he could see that the person detained by Deputy Hardin was the same person depicted in the photographs sent to his PDA. At that point, he identified the driver of the vehicle detained by Deputy Hardin as the robbery suspect and instructed Deputy Hardin to take him into custody. After doing so, Inv. Vinson remained at the scene until the vehicle had been processed.

### 5.  Testimony of Sgt. Dresser

Sgt. Dresser has been with the RCSO for nearly 15 years and participated in the investigation of the robbery of the Bank of America on February 13, 2009. Once he was informed about the incident, he proceeded to the bank to assist other officers in interviewing witnesses and later coordinated the identification show-up. Sgt. Dresser selected three Bank of America employees to participate in the show-up because they were present during the robbery, and, according to Sgt. Dresser, each had stated that they had gotten a good look at the robber's face. In fact, one of the individuals was the bank teller who had been robbed and stood face-to-face with the robber. While Sgt. Dresser acknowledged that he had access to still photographs of the robbery suspect and that some employees also viewed the

---

on his PDA on February 13, 2009.

photographs, he testified that none of the employees who participated in the show-up saw these photographs.

Once the robbery suspect had been taken into custody, Sgt. Dresser instructed Deputy Hardin and Deputy Garner to take him to the rear parking lot of the Bank of America, less than 15 feet from the back door of the bank, where the employees were to view the suspect. Upon the arrival of Deputies Hardin and Garner, Sgt. Dresser walked the employees toward an enclosed foyer separating the exterior of the building from the lobby area. Sgt. Dresser was adamant that before the show-up began, he informed the bank employees that they were not allowed to communicate with each other until the show-up was complete. Then, one by one, Sgt. Dresser allowed the employees to view the robbery suspect through a glass window on the upper part of the door, beginning with the teller who was robbed, Ms. Latoya Johnson. The only question Ms. Johnson was asked was whether she recognized anyone standing outside the bank, at which point she identified Defendant as the man who had robbed her. While Ms. Johnson was viewing the suspect and making her identification, the other two employees were standing within eyesight of Sgt. Dresser, and he did not observe Ms. Johnson speak to, or have any other contact with, either of the other two employees after she made her identification.

Sgt. Dresser then called for Ms. Gloria Ivory, another bank teller, to come to the window and asked her if she recognized anyone standing outside the bank. According to Sgt. Dresser, Ms. Ivory also identified the man standing outside the bank as the person she observed in the bank committing the robbery. Sgt. Dresser then allowed her to go back inside and called for Mr. Douglas Graves, another bank employee, to come to the window. Again,

Sgt. Dresser asked Mr. Graves if he recognized anyone standing outside the bank, and Mr. Graves also identified Defendant as the person who committed the robbery. According to Sgt. Dresser, Mr. Graves further stated that the only difference in appearance was that Defendant was not wearing the skull cap worn during the robbery. Sgt. Dresser then told Mr. Graves that he could go back inside and instructed Deputies Hardin and Garner that they could place Defendant back in the patrol car.

Notably, Sgt. Dresser testified that it was still daylight at the time the show-up took place and that there was nothing beyond the glass window obstructing the view of the employees who participated in the show-up. He further emphasized that the only question he posed to each of the employees was whether they recognized anyone standing outside the bank, and the show-up was conducted less than two hours after the robbery took place. While Sgt. Dresser did not recall that Defendant was taken out of the patrol car a second time (nor could he articulate a reason why that would have occurred), he did recall seeing several news agencies outside the bank while the show-up was being conducted.

**B.      Defendant's Case[14]**

### 1.      Testimony of Inv. Johnson

Inv. Johnson is employed by the RCSO and was on duty on February 13, 2009, when the Bank of America was robbed. Inv. Johnson testified that the description given of the

---

[14]Defendant subpoenaed Inv. Johnson, Inv. Cullinan, and Deputy Whitfield to testify at the August 10, 2009 hearing. (See doc. no. 53). Deputy Garner was subpoenaed by the government but was called to testify by Defendant. While the testimony of Inv. Johnson and Inv. Cullinan has little, if any, relevance to the issues presented in Defendant's motions, given Defendant's insistence that they be subpoenaed for the August 10th hearing, the Court has recounted their testimony in order to provide a full account of Defendant's case.

suspect was that of a light-skinned black male in his 50s wearing glasses and some kind of cap. Inv. Johnson further testified that he was the first investigator to arrive at the scene and was given a brief description of the suspect by bank employees upon his arrival. However, his job as a crime scene technician is to make sure that the crime scene is not contaminated, and he accordingly proceeded to secure the areas of the bank that may have contained relevant evidence. He obtained multiple fingerprints from the scene but did not compare them to those of the person later determined to be Defendant because he was informed that the FBI would do so.

### 2. Testimony of Inv. Cullinan

Inv. Cullinan is employed with the RCSO and was also on duty on February 13, 2009, when the Bank of America was robbed. After being advised by another officer of the robbery and that the tracking device was proceeding west on I-20, he accordingly headed in that direction. When Inv. Cullinan arrived at the Columbia County roadblock, he observed that the traffic had begun to slow and accordingly activated his blue lights to get to the front of the traffic. He then exited his car and proceeded to follow the instructions of Lt. Peebles to check the occupants of the slowed vehicles for an individual matching the description of the robbery suspect.

Inv. Cullinan also participated in the McDuffie County roadblock once it was learned that the suspect had made it through the Columbia County roadblock undetected. When Inv. Cullinan arrived at the scene of the arrest, the person who had been identified by Inv. Vinson as the robbery suspect was already arrested and seated in Deputy Hardin's patrol car. In processing the vehicle after the arrest, Inv. Cullinan inventoried the trunk area, which he

15

testified contained a battery starter and a black trash bag containing various items. There was no blue jacket in the trunk at the time Inv. Cullinan conducted the inventory because it had already been taken into evidence by Sgt. Sylvester.

### 3. Testimony of Deputy Whitfield

Deputy Whitfield is employed by the MCSO and was on duty on February 13, 2009, in McDuffie County when the Bank of America robbery took place in Richmond County. He became aware of the robbery at 3:58 p.m. when the call went out over the MCSO dispatch. Approximately 30 minutes later, Deputy Whitfield reported to exit 175 in the westbound lane of I-20 to begin looking for an individual matching the description of the robbery suspect. Deputy Whitfield acknowledged that he was initially informed by dispatch that the suspect was a black female in a silver Chevy Impala. However, Deputy Whitfield later explained that this description had originated from the comments of a law enforcement officer observing the slowed vehicles at one of the roadblocks, stating that he had seen a black female in a silver Chevy Impala proceeding through the roadblock.[15] The law enforcement officer communicated this information over his police radio, which was contemporaneously summarized by the dispatcher in the written dispatch log. Notably, Deputy Whitfield testified that the dispatcher has no authority to determine which information heard over the police

---

[15]Given Deputy Whitfield's testimony at the August 10th hearing that he had initially been informed to be on the lookout for a black female motorist in a silver Chevy Impala and Defendant's subsequent requests for any "exculpatory evidence" related to this individual (see doc. nos. 83, 86), the Court directed the government to produce Deputy Whitfield at the March 16th hearing to explain the origin of this information, (see doc. no. 93, p. 8). Deputy Whitfield was also instructed to bring with him copies of any records on which he relied at the August 10th hearing with respect to his testimony about the description of the suspect he had initially received on the day of the robbery. (Id.).

radios is accurate. Rather, she must simply summarize the officers' communications as she hears them over their radios. In any event, Deputy Whitfield was adamant that the initial description of the robber he received was simply a miscommunication from the dispatcher and ultimately had nothing to do with the outcome of the investigation and the arrest of the robbery suspect.

Deputy Whitfield went on to testify that when he arrived at exit 175, several patrol cars began passing him at high rates of speed, and he therefore decided to proceed to the McDuffie County roadblock. Notably, when Deputy Whitfield arrived at the McDuffie County roadblock, he was informed by a female officer from the RCSO that they were actually looking for an older, light-skinned black male with freckles. When Deputy Whitfield eventually arrived at the scene of the arrest, Deputy Hardin and the man later identified by Inv. Vinson as the robbery suspect were already standing near the trunk of the vehicle the suspect had been driving. Once Inv. Vinson had identified the man as the robbery suspect, Deputy Whitfield assisted in placing the suspect in handcuffs.

### 4.    Testimony of Deputy Garner

Deputy Garner has been employed by the RCSO for 11 years and was also on duty when the Bank of America was robbed on February 13, 2009. Deputy Garner testified that he became involved with the investigation when Lt. Gay asked him to proceed toward the location where the signal from the tracking device was being emitted because Deputy Garner had a tracking dog. Deputy Garner first reported to the Columbia County roadblock and, at the direction of Lt. Peebles, began observing occupants of the vehicles to see if any of them matched the description of the robbery suspect. When he was alerted by dispatch that the

17

tracking device was moving again, he left the Columbia County roadblock and proceeded toward the McDuffie County roadblock.

While Deputy Garner did not participate in the arrest of the man who had been identified by Inv. Vinson as the robbery suspect, he did follow Deputy Hardin back to the bank to assist her in the identification show-up. Deputy Garner was on the lefthand side of the suspect during the show-up, which he testified lasted for a couple of minutes. Deputy Garner also reported that there were news cameras to the suspect's left and members of the public sitting on their cars to the suspect's right while the show-up was being conducted. While Deputy Garner stated that he placed the suspect back in the car at one point and then removed him from the car a second time, he did not explain the reason for doing so.

### 5. Testimony of Defendant

After Deputy Garner testified at the August 10th hearing, Defendant took the stand and gave his version of the events leading to his arrest and identification as the robber. When counsel for the government attempted to cross-examine Defendant, however, he refused to answer her questions. Defendant was warned by the Court that if he refused to submit to cross-examination, his testimony would be stricken from the record. However, Defendant still refused to be cross-examined, and accordingly, his testimony has been stricken from the record. See United States v. Martino, 648 F.2d 367, 389 (5th Cir. 1981);[16] United States v. Two Parcels Prop. Located at 2730 Highway 31, Jemison, Chilton County, Ala., 909 F. Supp. 1450, 1456-57 (M.D. Ala. 1995) (citations omitted); see also McGautha v. California, 402 U.S. 183,

---

[16]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

215 (1971) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the [Fifth Amendment] privilege against cross-examination on matters reasonably related to the subject matter of his direct examination."), *vacated on other grounds by* Crampton v. Ohio, 408 U.S. 941 (1972).[17]

### 6. Testimony of Latoya Johnson

Latoya Johnson has been employed with the Bank of America for the past four years and is currently employed as a sales and services specialist, as she was on February 13, 2009. On that day, Ms. Johnson came back from lunch around 3:30 p.m. and assisted a number of customers before the robber approached her station. Gloria Ivory's station actually became available first, but when Ms. Ivory called for the robber, he motioned to the customer behind him to go ahead of him to Ms. Ivory's station. Once Ms. Johnson's station became available, the robber came up to the desk and stood only one to two feet away from her, thereby giving Ms. Johnson a chance to get a good look at the robber's face, even though it was partially concealed by a skull cap and sunglasses. The robber then pulled out a gun, held it up against

---

[17]Other courts have also followed this general rule where a witness refuses to submit to cross-examination. See United States v. Esparsen, 930 F.2d 1461, 1469-70 (10th Cir. 1991) (affirming trial court's decision to strike testimony of witness who refused to submit to cross-examination); United States v. Parcels of Land, 903 F.2d 36, 43 (1st Cir. 1990) ("It is well-accepted that a witness' direct testimony can be stricken if [he] invokes the [F]ifth [A]mendment on cross-examination to shield that testimony from scrutiny." (citations omitted)); Lawson v. Murray, 837 F.2d 653, 655-56 (4th Cir. 1988) (noting that "the [F]ifth [A]mendment provides no immunity from cross-examination for a witness who elects to testify" and finding that the trial court properly struck the testimony of a defense witness who invoked the Fifth Amendment privilege on cross-examination and deprived the government of the opportunity "to question the witness closely"); United States v. Doddington, 822 F.2d 818, 822 (8th Cir. 1987) (upholding trial court's decision to strike the entirety of defense witness's testimony when the witness "persisted in asserting his Fifth Amendment privilege against self-incrimination").

his chest, and said, "Do you see this?"[18] Ms. Johnson said, "Yes, sir," and the robber told her, "Give me all your money." Ms. Johnson retrieved all the money from her cash drawer except the bait money and gave it to the robber. The robber then told her, "Didn't I tell you to give me everything?" and Ms. Johnson, apparently pointing to the bait money, said, "Do you want this too?" The robber then said, "I said give me everything." Accordingly, Ms. Johnson also retrieved the bait money from the cash drawer and slid it to the robber over the counter.

The robber then asked Ms. Johnson where the bathroom was, and Ms. Johnson told him that it was "in the back." The robber then instructed her to go to the bathroom and not to look at or talk to anyone. Ms. Johnson complied with the robber's instructions and proceeded to the bathroom without looking at or speaking to anyone.[19] After the robber had left the bank, another bank teller came to the bathroom, whom Ms. Johnson told that she had been robbed. Ms. Johnson then proceeded to call 911, telling the dispatcher that she had been robbed by an African-American male in his late 50s or early 60s with freckles who had been wearing a black hat, sunglasses, a dark jacket, and a black shirt underneath the jacket. She also told the 911 dispatcher that the robber had been holding a black gun.

After the robbery occurred, several law enforcement officers arrived at the bank, and Ms. Johnson later gave a description of the robber to one of the officers. Ms. Johnson stated that while the police were in the bank, she could hear some of the transmissions coming over their police radios and eventually became aware that the suspect was being tracked based on

[18]Although Ms. Johnson's attention was briefly directed away from the robber's face when he pulled out the gun, the robber later concealed the gun in his jacket pocket, and Ms. Johnson was still looking at the robber while he gave her the instructions described above.

[19]Although Ms. Johnson had access to a silent alarm, she testified that she did not want to risk tipping the robber off by pressing it during her encounter with him.

the tracking device that had been secreted in the bait money. However, at no time did she see surveillance video of the robber or any other photographs depicting the robber before the show-up was conducted. Nor was she aware of the presence of any media or other onlookers outside the bank, since the window blinds had been closed following the robbery.

Ms. Johnson was later informed that an arrest had been made and a show-up of the suspect was going to be conducted. Once Deputy Hardin and Deputy Garner arrived at the bank, Sgt. Dresser led the three bank employees that he had selected to participate in the show-up toward the foyer area, where they were to view the suspect. While Ms. Johnson's husband was allowed to accompany her to the door leading to foyer area, he was not with her when she made her identification. However, Ms. Johnson does not know where either Ms. Ivory or Mr. Graves were while she made her identification, which she did prior to Ms. Ivory and Mr. Graves being asked to view the suspect. When Ms. Johnson viewed the suspect, he was standing approximately 15 feet away from her, in front of a car, handcuffed, and wearing a black shirt. Ms. Johnson identified Defendant as the robber almost immediately after he got out of the car, based on his skin tone, hair, freckles, height, and the shape of his face. Ms. Johnson was certain of her identification, which she testified was based on her observations at the time of the robbery and not anything that the law enforcement officers did or said or anything that had occurred at the bank after the robbery took place. Ms. Johnson was adamant that neither Sgt. Dresser or any other law enforcement officer did anything to influence her identification.

21

### 7.    Testimony of Douglas Graves

Douglas Graves is a bank officer at the Bank of America and was so employed on February 13, 2009.  Mr. Graves specifically recalled that February 13th was an "abnormally warm day" and that many of the bank customers were wearing "spring-type attire."  Around 3:30 p.m., Mr. Graves was sitting at his desk in the center of the bank when he saw a man enter the bank wearing a black jacket, a dark hat, and sunglasses, which he thought was odd, considering the warm weather.  The man then proceeded to the teller line and eventually to Ms. Johnson's teller station, which was about 10 to 20 feet away from where Mr. Graves was sitting.  Mr. Graves was assisting another customer at the time the robbery occurred, and from what Mr. Graves could see, the robber's encounter with Ms. Johnson looked like a normal transaction.  Mr. Graves then saw the man exit the bank from the back exit.  At that point, Ms. Johnson screamed, and Ms. Ivory said that the bank had been robbed.  Mr. Graves then went to lock the doors and saw the robber walking down the sidewalk.  While Mr. Graves admitted that he was assisting a customer when the robbery occurred, he nonetheless maintained that he got a "really good look" at the robber because of the location of his desk in the center of the bank and because the robber "caught his attention" due to his unseasonable attire.

Following the robbery, law enforcement officers arrived at the bank with their police radios.  While Mr. Graves heard transmissions coming over the radios, he was not aware of what those transmissions pertained to.  However, at some point, Mr. Graves became aware from the bank's corporate security personnel that police were tracking a suspect based on the tracking device secreted in the bait money that had been given to the robber.  Mr. Graves was adamant that he never saw surveillance video or any other photographs depicting the robber

22

before the show-up was conducted. Nor was he aware of the presence of any media or other members of the public outside the bank because the window blinds in the bank had been closed, which Mr. Graves testified was standard procedure after a robbery occurs.

Mr. Graves was later informed that a suspect had been arrested in possession of the tracking device and that the suspect was being brought back to the bank for identification. When the suspect arrived, Sgt. Dresser led Mr. Graves, Ms. Johnson, and Ms. Ivory toward the foyer area to attempt to identify the suspect, which was about 10 to 20 feet from the bank. Although he was not sure in which order they were called, Mr. Graves was adamant that he, Ms. Johnson, and Ms. Ivory were called into the foyer area one at a time to view the suspect. Mr. Graves further stated that Sgt. Dresser did not do anything before or during the show-up to influence his identification. Nor did he feel any kind of pressure from his co-workers or other law enforcement officers to make an identification. When the suspect was presented for identification to Mr. Graves, he was wearing a black shirt and eyeglasses and was standing in front of a police car. Mr. Graves was not sure if the suspect was handcuffed or not. Before identifying Defendant as the robber, Mr. Graves took a good look at him but did not take very long after viewing him to make his identification. Mr. Graves was adamant that there was "no doubt" that Defendant was the person who robbed the bank, specifically stating to Sgt. Dresser that the only differences in appearance were that Defendant was not wearing the sunglasses and skull cap that he had been wearing at the time of the robbery. Only after the show-up had concluded did Mr. Graves become aware that the jacket and the bank funds had been recovered from Defendant's vehicle.

23

### 8.    Testimony of Gloria Ivory

Gloria Ivory is currently employed by the Bank of America as a teller supervisor, as she was on February 13, 2009. Prior to the robbery, Ms. Johnson had recently come back from lunch, and the lobby was "quite busy." When Ms. Ivory had finished assisting her previous customer, she called for the next person in line, which was the robber. However, the robber motioned for the person behind him to go ahead of him, and when Ms. Johnson had finished with her customer, the robber went to her station. While Ms. Ivory's next customer was getting his materials together to complete his transaction, Ms. Ivory slid toward Ms. Johnson's desk and saw that her cash box was practically empty, containing only one stack of cash. She then heard Ms. Johnson say to the robber, "Do you want this too?" At that point, Ms. Ivory went back to her station and pressed her silent alarm because she knew that a robbery was taking place.

Because her station was next to Ms. Johnson's, Ms. Ivory only got a "side view" of the robber, and she testified that she made a concerted effort not to make eye contact with the robber so that he would not know that she was aware of what was going on. Ms. Ivory also got a brief look at the robber before he proceeded to Ms. Johnson's station because the opening of the teller line is directly in front of her desk. While Ms. Ivory stated that she saw certain photographs of the robber after the robbery occurred, she could not remember whether she saw them before or after the suspect was brought back to the bank for identification. However, at some point, Ms. Ivory did become aware that the police were tracking a suspect based on the signal emitted from the tracking device that had been secreted in the bait money, although she did not testify as to how she became aware of this information.

Once the suspect arrived at the bank, Sgt. Dresser called for the three bank employees to view the suspect from the foyer area of the bank, one at a time. While Ms. Ivory did not recall the order in which they were called to view the suspect, she did recall that the only person in the foyer when she was asked to view the suspect was Sgt. Dresser. Ms. Ivory testified that after viewing the suspect (who was wearing eyeglasses, standing in front of a police car, and appeared to be handcuffed), she was unable to positively identify him as the robber because, as she testified, he was not wearing the jacket, hat, or sunglasses that the robber wore. She then went back to her duties inside the bank. Ms. Ivory does not recall whether she, Ms. Johnson, or Mr. Graves were asked to identify (or attempt to identify) the suspect a second time. With that testimony in mind, the Court turns to the issues raised in Defendant's motions to suppress.

## III. DISCUSSION

In his motions, Defendant presents several bases for suppressing the evidence found in his trunk, namely that (1) the roadblocks set up in Columbia and McDuffie Counties were unconstitutional, (2) police did not have probable cause to arrest him, and (3) he did not give his consent to search the trunk of the vehicle he was driving. He also requests that any positive identifications made by the bank employees be suppressed because the circumstances of the show-up were unduly suggestive.

### A.     Constitutionality of Roadblocks

The Court begins by noting that it previously repeatedly denied Defendant permission to subpoena various individuals to testify regarding the constitutionality of the roadblocks set up in this case because his argument that these roadblocks were unconstitutional was squarely

foreclosed by Supreme Court precedent, and thus the testimony of such individuals was not necessary at the August 10th hearing. (See doc. nos. 53, 57). When Defendant proceeded to engage in a line of questioning with Lt. Peebles at the August 10th hearing about the nature of the roadblocks, the Court advised Defendant that, as was the case with his requests for subpoenas, Supreme Court precedent also foreclosed any argument that the roadblocks in question provided any basis for suppression.

Notably, the only circumstances that Defendant had alleged in his motions that made the roadblocks unconstitutional were the number of miles (10) and the length of time (20 to 30 minutes) that traffic was backed up as a result of the roadblocks. (See doc. no. 35, p. 3). While the source of this information was simply an online article from the local newspaper in McDuffie County and not any type of discovery material or affidavit (see id., Ex. 1), the government did not dispute these assertions in its response to Defendant's motions. Rather, it argued that under the circumstances presented, where there was a dangerous suspect that the police knew was fleeing by way of a particular route (based on the signal being emitted from the tracking device), the roadblocks were constitutional. (See generally doc. no. 40). Thus, there were no facts in dispute and, as discussed in the following paragraph, the facts alleged by Defendant, even if true, did not provide a basis for suppression. As the matter was purely a question of law, the Court found that it was not necessary to hear any testimony or receive any evidence on this issue, and therefore, Defendant was not permitted to engage in any further questioning on this matter. See United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) (finding that district court properly exercised its discretion in refusing to conduct an evidentiary hearing where the facts alleged, even if proven true, did not provide

a basis for suppression); see also United States v. Horne, 198 Fed. App'x 865, 870 (11th Cir. 2006) (*per curiam*) (holding that evidentiary hearing on motions to suppress not necessary where there were no disputed issues of fact and the motions presented only issues of law).

Even assuming that traffic was backed up for 10 miles and motorists were delayed by 20 to 30 minutes, the roadblocks in this case provide no basis for suppression. Indeed, the delay experienced by motorists as a result of a roadblock is not, standing alone, enough to make a roadblock unconstitutional. See Merrett v. Dempsey, No. TCA 84-7198-WS, 1993 WL 774466 (N.D. Fla. Apr. 2, 1993), *aff'd*, Merrett v. Moore, 58 F.3d 1547 (11th Cir. 1995). Furthermore, in City of Indianapolis v. Edmond, 531 U.S. 32 (2000), the case on which Defendant primarily relies to contest the constitutionality of the Columbia and McDuffie County roadblocks, the Supreme Court held that roadblocks set up for the primary purpose of investigating general criminal conduct were not constitutional under the Fourth Amendment. Edmond, 531 U.S. at 43-44. However, the Supreme Court also emphasized an exception to the general prohibition against roadblocks, stating that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up . . . to catch a dangerous criminal who is likely to flee by a particular route." Id. at 44.

As previously noted in one of this Court's Orders denying Defendant's request for subpoenas for certain witnesses to testify at the August 10th hearing regarding the facts and circumstances surrounding the implementation of the roadblocks (see doc. no. 57, p. 2), this exception emphasized by the Supreme Court in Edmond is applicable to the facts of this case. Indeed, an armed robbery suspect is no doubt a dangerous criminal, and the record establishes that police knew that the suspect was fleeing west on I-20 based on the signal from the

27

electronic tracking device. See United States v. Abbott, 265 Fed. App'x 307, 309 (5th Cir. 2008) (finding that a roadblock set up to catch a bank robber was constitutional where, *inter alia*, the defendant's vehicle was located in dense traffic where electronic tracking devices embedded in stolen money suggested the car was to be found). The fact that Defendant matched the description of the robbery suspect and the presence of the electronic tracking device in his vehicle also undermines Defendant's argument that police did not possess "individualized suspicion" to investigate him further. (See doc. no. 56, pp. 2-3).

In sum, the circumstances alleged by Defendant regarding the effects of the roadblocks on the flow of traffic do not, standing alone, make them unconstitutional, and the exception emphasized in Edmond applies to the facts of this case. Accordingly, the Court finds that the roadblocks in this case were constitutional and, as noted at the August 10th hearing, do not provide a basis for suppression.

## B. Probable Cause to Arrest

Defendant also contends that law enforcement officers did not have probable cause to arrest him because the photo received by Inv. Vinson on his PDA was not a photo of the suspect from the crime scene. Thus, Defendant maintains that Inv. Vinson misidentified him as the robber at the scene of the arrest. On the other hand, the government maintains that the correct photographs were used to identify Defendant and that these photographs and other circumstances establish probable cause for Defendant's arrest. The government has the better argument.

Probable cause to arrest a suspect requires a greater certainty of criminal behavior than reasonable suspicion, but probable cause "does not require the same standard of

conclusiveness and probability as the facts necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 873 (11th Cir. 2003)). Specifically, "[p]robable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Gordon, 231 F.3d 750, 758 (11th Cir. 2000) (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992)).

Defendant's contention that the police lacked probable cause to arrest him appears to be based on the fact that S.A. Deprizio showed him a photograph from a bank robbery in Greenwood, South Carolina at some point after Defendant had been arrested. (See doc. no. 35, pp. 7-8). However, Defendant's conclusion that Inv. Vinson had that same photo on his PDA when he identified Defendant as the robbery suspect at the McDuffie County roadblock simply because S.A. Deprizio had it on his PDA is pure conjecture and unsupported by the record. Indeed, Inv. Vinson testified that he received the photographs of the robbery suspect on his PDA from S.A. Ozden, who had taken still photographs of the surveillance video at the Bank of America. While the original photographs sent by S.A. Ozden were lost when the FBI's email system was compromised, the government was later able to obtain still photographs taken from the same surveillance video from Bank of America security personnel. (See doc. no. 46, p. 1). Inv. Vinson testified that these photographs were identical to those received on his PDA on February 13, 2009, and used to identify Defendant. Thus, as noted above, any contention that Inv. Vinson used the wrong photographs to identify Defendant is pure conjecture and unsupported by the record.

Having determined that the photographs received by Inv. Vinson were those taken of the robbery suspect at the Bank of America robbery on February 13, 2009, the Court notes that the recognition of a suspect based on surveillance photographs can alone be sufficient to establish probable cause to arrest. See United States v. Melton, 75 Fed. App'x 539, 542 (7th Cir. 2003) (citing United States v. Springs, 188 F.3d 829, 839 (7th Cir. 1994)); see also United States v. Brown, 822 F. Supp. 750, 753 (M.D. Ga. 1993) (finding that police officers had probable cause to arrest where the defendant had been identified as the person appearing in a surveillance photograph taken during a bank robbery), aff'd, 50 F.3d 1037 (11th Cir. 1995) (Table). Thus, Inv. Vinson's identification of Defendant as the robbery suspect based on the surveillance photographs received on his PDA supports a finding of probable cause.

However, the existence of probable cause to arrest in this case is not predicated solely on Inv. Vinson's identification of the man detained by Deputy Hardin as the robbery suspect. Indeed, other circumstances at the scene of the arrest also establish the existence of probable cause to arrest. First, as Sgt. Sylvester testified, the signal from the tracking device that had been secreted in the bait money became more frequent as he approached the vehicle the suspect had been driving and became constant upon arriving at the trunk area of the vehicle. Deputy Hardin's observation of the bank bag and jacket (which fit the general description of the type of jacket worn by the robber) in the trunk prior to the arrest, as well as the suspect's actions in lunging toward the trunk of the vehicle once the bank bag and jacket had been discovered, further support a finding of probable cause. Thus, the Court finds that the arrest was supported by probable cause, and this argument does not provide a basis for suppression.

## C.    Consent to Search

Defendant next contends in his motions that he did not consent to the search of his trunk. Specifically, Defendant argues that when Deputy Hardin asked whether he minded if she searched his trunk, he replied, "Sure." Defendant states that his response meant "no" in this context, such that he did mind if Deputy Hardin searched his trunk. (Doc. no. 35, p. 7). At the hearing, Deputy Hardin described the same conversation but stated that she interpreted the response to mean that Defendant consented. In other words, she interpreted his response to mean, "Sure. Go ahead and search the trunk." Although Defendant maintained in his testimony that he did not consent to the search, as noted above, his testimony has been stricken from the record for failure to submit to cross-examination. Thus, the only testimony in the record is that of Deputy Hardin, who maintained that Defendant did give his consent for her to search the trunk.

Notably, other circumstances support Deputy Hardin's interpretation of the exchange. Indeed, before Deputy Hardin requested permission to search the trunk, Defendant willingly complied with her request that he step out of his vehicle. Importantly, Deputy Hardin testified that Defendant used the automatic button on his own key fob to open the trunk, whereupon Deputy Hardin saw a bank bag and a jacket that fit the general description of the type of jacket worn by the robber. When Deputy Hardin requested permission to investigate further, Defendant said "No," and Deputy Hardin immediately stopped her search. In sum, the record indicates that the driver of the vehicle cooperated with Deputy Hardin and willingly complied with her instructions up until Deputy Hardin observed the bank bag and jacket in the trunk.

31

Accordingly, these circumstances support Deputy Hardin's determination that Defendant had consented to the search of the trunk.

Having found that Defendant consented to the search of the trunk, the Court must next consider whether the consent given was voluntary. Although Defendant did not raise the issue of voluntariness in his motions, he did suggest in his cross-examination of Deputy Hardin that her failure to advise him of his right to refuse consent or afford him time to consider his decision (with or without the advice an attorney) rendered his consent involuntary. When the government relies on consent to validate a search, it has the burden of proving that the consent was voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 222-23 (1973). Specifically, the government must show that, under the totality of the circumstances, the consent was basically a free and unconstrained choice; that is, the person's will was not overborne, and his capacity for self determination was not critically hampered. United States v. Watson, 423 U.S. 411, 424 (1976). Whether the subject of the search knew he had a right to refuse consent, though a factor to consider, is not controlling. Schneckloth, 412 U.S. at 234. In the Eleventh Circuit, a court examining whether a suspect voluntarily consented to a search should consider the following non-exhaustive list of factors, none of which is dispositive:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse consent to the search, the defendant's education and intelligence, and significantly, the defendant's belief that no incriminating evidence will be found.

Tukes v. Dugger, 911 F.2d 508, 517 (11th Cir. 1990) (citing United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984) (quoting United States v. Phillips, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981))).

Here, the government has met its burden of demonstrating that the consent given was voluntary. Indeed, the circumstances discussed above that support Deputy Hardin's interpretation that the man later identified as Defendant consented to a search of his trunk also support a finding that the consent was voluntary. Indeed, as noted above, Defendant cooperated with Deputy Hardin during the encounter by willingly complying with her request to step out of his vehicle and using the automatic button on his own key fob to open the trunk. Moreover, the Court does not consider Deputy Hardin's actions in removing Defendant from the rear of the vehicle to be evidence of "coercive police procedure" for several reasons. First, these actions were taken to preserve evidence, not to obtain consent. Indeed, Defendant had already consented to Deputy Hardin's initial search of his trunk when he lunged toward the jacket, which necessitated Deputy Hardin's actions. Moreover, the record establishes that after Defendant lunged toward the jacket, no further search of the trunk took place until Inv. Vinson identified him as the robbery suspect and Sgt. Sylvester arrived with the receiver that was indicating that the tracking device was in close proximity.

In addition, the record establishes that Defendant never asked for an opportunity to consider his decision or for permission to call an attorney before making his decision.[20]

---

[20]To the extent Defendant may have raised a veiled argument about his opportunity to consult an attorney, the Court finds that this argument is but a red herring for several reasons. Indeed, Defendant did not reference any type of Miranda issue anywhere in any of his motions to suppress. See Miranda v. Arizona, 384 U.S. 436 (1966). Rather, the only time Defendant even mentioned anything about an attorney occurred while he was questioning Deputy Hardin at the August 10th hearing about the voluntariness of his consent to the initial search of his trunk, during which Defendant asked Deputy Hardin a single question about whether she gave him the chance to call an attorney before he decided whether or not to consent to the initial search. The Court also notes Defendant did not make any other reference to this issue in his questioning of any of the other witnesses called at the August 10th hearing. In sum, as Defendant never even alluded to a Miranda issue in his motions to

Accordingly, Defendant's "after-the-fact" challenge is insufficient to establish that his consent was involuntary, especially when the totality of the circumstances demonstrate that, up until the discovery of the bank bag and the jacket, he had cooperated with Deputy Hardin and willingly complied with all of her instructions. In sum, the Court finds that Defendant did consent to the search of the trunk and that the consent given was voluntary. Accordingly, this challenge also fails to provide a basis for suppression.

## D. Identification Testimony

Defendant's final argument is that any positive identifications made by the Bank of America employees should be suppressed because the circumstances under which the show-up was conducted were unduly suggestive.[21] Specifically, Defendant contends in his motions that the show-up was unduly suggestive because he was presented for identification handcuffed

---

suppress but rather in only one question to a single witness about a separate issue regarding the voluntariness of his consent, the Court finds this issue to simply be a red herring and declines to address it further. See United States v. Ramirez Ordaz, No. 1:06-CR-212, 2007 WL 196864, at *2, 6 (N.D. Ga. Jan. 23, 2007) (citing United States v. Smith, 416 F.3d 1350, 1352 n.1 (11th Cir. 2005)) (refusing to address issue regarding probable cause to arrest where issue not properly raised in motion to suppress or at evidentiary hearing).

[21]The Court notes that Ms. Ivory testified that after she had the chance to view the robbery suspect outside the bank, she was not able to identify the suspect as the person who robbed the bank, while Sgt. Dresser testified that all of the bank employees who participated in the show-up identified the suspect presented for identification as the robber. However, the Court need not resolve this discrepancy because, as discussed below, the testimony demonstrates that any positive identifications made should not be suppressed because the circumstances of the show-up were not unduly suggestive. The Court also notes that any suggestion that the conditions under which the show-up was conducted were unduly suggestive is undermined by Ms. Ivory's testimony that she was not able to identify the man presented for identification as the robber. Indeed, Ms. Ivory's inability to identify the suspect presented for identification as the man who robbed the bank indicates that the environment at the bank prior to the show-up and the circumstances under which the show-up was conducted did not result in any type of pressure on the bank employees to positively identify the man presented for identification as the individual who robbed the bank.

34

in front of a police car and was flanked by two police officers. Defendant also appeared to suggest during his examination of multiple witnesses that the show-up was unduly suggestive because he was presented for identification twice and because the media and other onlookers were present.

The Eleventh Circuit requires a two-step analysis to determine whether an identification process is so unreliable as to violate due process. Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987).

> We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry. If so, however, we must then determine whether the suggestive procedure, given the totality of the circumstances, created a substantial risk of irreparable misidentification at trial. Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986), *modified in part on other grounds*, 809 F.2d 750 (11th Cir. 1987); Passman v. Blackburn, 652 F.2d 559, 569 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1022, 102 S. Ct. 1722, 72 L. Ed.2d 141 (1982). Under this analysis, "reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed.2d 140 (1977).

Id. (emphasis added) (footnote omitted). The factors that go into the "totality of the circumstances" analysis include: "the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification." Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991) (citing Neil v. Biggers, 409 U.S. 188, 199 (1972)).

### 1. Handcuffs, Police Car, and Police Officers

The Court begins with Plaintiff's contentions that his presentation in handcuffs in front of a police car and flanked by two police officers made the show-up unduly suggestive. Notably, the testimony of Deputy Hardin, Deputy Garner, and the bank employees confirms

that the show-up did take place under these circumstances.[22]  However, the Eleventh Circuit

has found in analogous cases that such circumstances do not constitute an unduly suggestive

show-up.  See United States v. Walker, 201 Fed. App'x 737, 741 (11th Cir. 2006) (finding

that show-up was not unduly suggestive where suspect presented in handcuffs and surrounded

by police officers); Johnson v. Dugger, 817 F.2d 726, 728-29 (11th Cir. 1987) (per curiam)

(finding that show-up was not impermissibly suggestive when suspects presented in the back

of a patrol car for identification); see also United States v. Martinez, 462 F.3d 903, 911 (8th

Cir. 2006) (finding that show-up was not unduly suggestive where defendant was presented

in handcuffs in the presence of police officer after being driven to the scene of the crime in

a police car because such circumstances were "[n]ecessary incidents of on-the-scene

identifications" (quoting United States v. King, 148 F.3d 968, 970 (8th Cir. 1998))); United

States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (noting that the "fact that the suspects were

handcuffed, in the custody of law enforcement officers, and illuminated by flashlights . . . did

not render the pre-trial identification procedure unnecessarily suggestive" because these

circumstances were all "necessary incidents of an on-the-scene identification" performed at

night).

As Defendant has failed to demonstrate that the show-up was unduly suggestive under

the first prong of the Williams test, the Court's analysis need not proceed any further as to the

---

[22]Notably, Deputy Hardin testified that the robbery suspect was handcuffed behind his back such that the employees who participated in the show-up could not see the handcuffs but could only see the suspect's face and front torso.  However, Ms. Ivory testified that she did draw the inference that the suspect was wearing handcuffs because his hands were behind his back.

circumstances of the show-up discussed in this section. Thus, these circumstances do not provide a basis for suppressing any positive identifications made by the bank employees.

### 2. Presence of Media and Other Onlookers

Turning to Defendant's contention that the presence of media and members of the public made the show-up unduly suggestive, the Court notes that there was a conflict in testimony on this issue. Indeed, Deputy Hardin does not recall whether these onlookers were present during the show-up, while Deputy Garner stated that there were news cameras to the suspect's left and other individuals to the suspect's right while the show-up was being conducted. Sgt. Dresser also recalled the presence of news agencies. However, the Court need not resolve this issue because Ms. Johnson and Mr. Graves both testified that they were unaware of the presence of the media and other onlookers, if any, because once the robbery occurred, the window blinds were closed pursuant to the bank's customary procedures following a robbery. Thus, even if the media or other members of the public were present, because the bank employees never saw them, their presence could not have influenced any positive identifications made or otherwise made the circumstances of the show-up unduly suggestive.

In any event, the Court notes that several other courts have held that as a general matter, media exposure and the involvement of the media do not taint identification procedures. See United States v. Zeiler, 447 F.2d 993, 995-96 (3d Cir. 1971) ("[W]e do not believe that such publicity was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable identification.'" (quoting Simmons v. United States, 390 U.S. 377, 384 (1968))); Edwards v. Murphy, 96 F. Supp. 2d 31, 47-48 (D. Mass. 2000) (noting

trial judge's decision in underlying criminal case that media exposure did not make show-up impermissibly suggestive); United States v. Hunter, 982 F. Supp. 541, 545-46 (N.D. Ill. 1997) (finding that the fact that photographs of the defendant had aired on television and in print media prior to witness identifications did not establish that the procedures used were unduly suggestive).

The involvement of the media in this case, if any, is less intrusive than that in the cases cited above. Indeed, in the show-ups and photographic arrays challenged in those cases, the suspect's photograph had been displayed on television or in print (or both) prior to the show-ups that were conducted. See Zeiler, 447 F.2d at 994; Edwards, 96 F. Supp. 2d at 48; Hunter, 982 F. Supp. at 545. Nevertheless, the courts in each of those cases found that such media exposure did not make the show-ups and photo arrays unduly suggestive. See Zeiler, 447 F.2d at 995-97; Edwards, 96 F. Supp. 2d at 48-49; Hunter, 982 F. Supp. at 545-46. Accordingly, even assuming that the media and other onlookers were present, such circumstances did not make the show-up unduly suggestive, given the minimal level of intrusiveness of the media in this case, if any, and more importantly, the fact that both Ms. Johnson and Mr. Graves testified that the window blinds in the bank had been closed, and they were therefore unaware of the presence of any media or other onlookers.

As Defendant has again failed to demonstrate that the identification show-up was unduly suggestive under the first prong of the Williams test, the Court's analysis need not proceed any further as to the circumstances of the show-up discussed in this section. Accordingly, such circumstances also fail to provide a basis for suppressing any positive identifications made by the bank employees.

### 3. Multiple Show-Ups

Turning to Defendant's contention that two show-ups were conducted, the Court begins by noting that, again, there was a conflict in testimony on these issues at the hearing. Indeed, Sgt. Dresser testified that the robbery suspect was presented only once for identification by the Bank of America employees, while Deputy Garner and Deputy Hardin testified that they brought the suspect out of the patrol car a second time (although they did not explain the reason for doing so). Thus, the Court must first address the threshold issue of credibility, and such determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the fact finder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits the testimony of Sgt. Dresser that there was only one show-up conducted for several reasons. To begin, Sgt. Dresser was the law enforcement officer who had the most involvement with the show-up and actually coordinated and conducted it. Specifically, Sgt. Dresser testified that each employee who participated in the show-up viewed the suspect once, and he then permitted each of them to go back inside the bank after they had viewed him. Furthermore, Sgt. Dresser testified that he did not "re-call" any of the employees to make an identification, nor does this Court find that there was a need to do so, since Sgt.

Dresser testified that none of the positive identifications made were in any way uncertain. Notably, Mr. Graves testified that he informed Sgt. Dresser that the only differences in appearance were that Defendant was no longer wearing the sunglasses or skull cap worn during the robbery. The Court also notes that neither Deputy Hardin or Deputy Garner explained why they removed the suspect from the patrol car for a second time. Indeed, the suspect could have been placed back in the car in between the identifications of two employees or for his own protection. Regardless, Deputies Garner and Hardin were outside the bank while the show-up was being conducted (without any knowledge of what was occurring with the employees inside the bank), and Sgt. Dresser was in a better position to know whether the suspect apprehended by police was presented more than once for identification to each employee.

Finally, Sgt. Dresser's decisions prior to the presentation of the suspect for identification indicate that he made every effort to ensure that only one identification per employee would be necessary. Specifically, Sgt. Dresser testified that he selected Ms. Johnson, Ms. Ivory, and Mr. Graves because they were present during the robbery, and each had informed him that they had gotten a good look at the robber.[23] Stated otherwise, these employees would not need more than one opportunity to view the suspect apprehended by police to determine whether or not he was the individual who had robbed the bank. Thus, the Court credits the testimony of Sgt. Dresser that only one show-up took place and therefore finds that Defendant's argument that two show-ups were conducted (thereby making them

---

[23] As noted previously, while the testimony of Ms. Ivory and Sgt. Dresser conflict as to whether Ms. Ivory got a good look at the robber and whether she was able to identify the robber, there is nothing to suggest that Sgt. Dresser did not follow the proper procedures to determine which employees would be best able to identify the robber.

unduly suggestive) is without merit. Accordingly, this circumstance also fails to provide a basis for suppression of any positive identifications made by the bank employees.[24]

The Court concludes by noting that its recommendation that the identification testimony should not be suppressed in no way prohibits Defendant from cross-examining the pertinent witnesses at trial as to any inconsistencies or discrepancies in their testimony[25] or otherwise questioning them with respect to the procedures used during the identification show-up and the reliability of any positive identifications made. Cf. Simmons v. United States, 390 U.S. 377, 384 (1968) (noting that the danger of misidentification by eyewitnesses in pre-trial identification procedures may be "substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error"); Irwin v. McDonough, 243 Fed. App'x 486, 494 (11th Cir. 2007) (per curiam) (citing Simmons, 390 U.S. at 384) (noting that inconsistencies regarding the ability of the witness to identify the

---

[24]The Court also notes that Defendant suggested during his examination of the bank employees that their identifications may have been influenced by transmissions they heard over the police radios regarding the tracking of the suspect. While all three employees had become aware that a suspect was being tracked, the Court notes that both Ms. Johnson and Mr. Graves, both of whom testified that they positively identified Defendant as the robber, maintained that their identifications were not influenced by this "police chatter," but rather on their observations of the robber while he was in the bank. Notably, Mr. Graves further testified that while he heard certain transmissions coming over the police radios, he was unable to decipher what those transmissions pertained to.

[25]For example, as noted above, Sgt. Dresser testified that Ms. Ivory identified the suspect presented for identification as the robber, while Ms. Ivory testified that she was unable to make a positive identification. Furthermore, the bank employees described the robber as wearing a dark jacket, while law enforcement officers recovered a light blue jacket from the trunk of Defendant's vehicle. However, the Court notes that this discrepancy regarding the color of the jacket does not change the fact that the jacket recovered by the police fit the general description of the type of jacket worn by the robber. In any event, as noted above, nothing in this Report and Recommendation prevents Defendant from exploring these discrepancies at trial.

petitioner as the perpetrator of the crime were brought out during trial, thereby reducing the danger that the petitioner's conviction was based on misidentification); United States v. Otero-Hernandez, 418 F. Supp. 572, 575 (D.C. Fla. 1976) (citing Simmons for the proposition that "[a]ny indication that the out-of-court procedure was suggestive . . . or was otherwise conducted in an improper manner can be tested and resolved by adversary proceedings at trial").

## IV.   CONCLUSION

In conclusion, the Court finds that the roadblocks were constitutional, probable cause existed to arrest Defendant, and Defendant voluntarily consented to the search of his trunk. Furthermore, the Court finds that none of the circumstances of the show-up made the identification procedure unduly suggestive.   Therefore, the Court **REPORTS** and **RECOMMENDS** that the motions to suppress be **DENIED**.  (Doc. nos. 22, 25, 29, 35).

SO REPORTED and RECOMMENDED this _16th_ day of April, 2010, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE